*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

**ENTRY ORDER**

SUPREME COURT DOCKET NO. 2011-279

DECEMBER TERM, 2011

In re K.C., Juvenile    }  APPEALED FROM:
             }
             }  Superior Court, Washington Unit,
             }  Family Division
             }
             }
             }  DOCKET NO. 149-12-09 Wnjv

               Trial Judge: Brian J. Grearson

In the above-entitled cause, the Clerk will enter:

Mother appeals an order of the superior court, family division, terminating her residual parental rights with respect to her daughter, K.C. We affirm.

K.C. was born in January 2008 to mother and Ricky Curtis, a convicted child sex offender. Mother's two other children from a different father, J.M. and A.M., were born in December 2004 and April 2006, respectively. Mother and Curtis began an intimate relationship in the fall of 2006, at which time the Department for Children and Families (DCF) warned mother of Curtis's background and against allowing any unsupervised contact between him and the children. In April 2008, three months after K.C.'s birth, then four-year-old J.M. revealed that Curtis had sexually abused her. Mother denied that Curtis posed a threat to the children or had ever been left alone with them. Based on the claim of sexual abuse and other issues concerning the children, DCF filed a petition alleging that the children were in need of care or supervision (CHINS). Following a hearing, the CHINS court found that although there was insufficient evidence that Curtis had abused J.M., he represented a substantial risk of harm to J.M. and A.M., which was magnified by mother's disbelief that he posed any danger to the children. The court further found that mother had neglected the two older children's medical needs. Based on these findings, the court adjudicated the children CHINS and they remained in DCF custody.

A disposition hearing followed in late July 2008. The disposition order in connection with J.M. and A.M. called alternatively for reunification or termination of parental rights (TPR). The plan of services required mother, among other things: (1) to attend individual therapy and address her own victimization so as to gain insights that would help keep her children safe; and (2) to work with a parent educator on parenting skills, proper nutrition, and dental health. Further, mother was prohibited from allowing Curtis to have unauthorized contact with her children or to enter her home. The disposition order in the case involving K.C., issued the same

day, provided for ongoing DCF custody, with placement at home with mother. The order required that Curtis's contact with K.C. be supervised at the DCF office. Although mother engaged in counseling and worked with a parent educator, she continued to believe that Curtis did not pose a risk of harm to her children.

In December 2008, K.C.'s attorney moved to have her removed from mother's home because of reports that mother was having regular, clandestine, and unauthorized contact with Curtis at her home and elsewhere. Following an evidentiary hearing, the court ordered mother to discontinue contact with Curtis. Approximately one month later, in January 2009, DCF moved for a protective order to restrict Curtis's contact with J.M. and A.M. in anticipation of their return to mother's care. The court issued an order requiring Curtis to remain at all times at least 300 feet from J.M. and A.M. for one year. This Court upheld that order in May 2009. See In re J.M. & A.M., No. 2009-031, 2009 WL 2427979 (Vt. May 29, 2009) (unpub. mem.), available at: http://www.vermontjudiciary.org/d-upeo/upeo.aspx.

J.M. and A.M. were returned to mother's care in June 2009, although DCF retained legal custody. During the summer of 2009, mother began a new relationship with someone who had an extensive criminal record, although no sex offenses. She did so without informing DCF of the new development. She also allowed a paroled child sex offender to visit her apartment on numerous occasions and lied to DCF about it. Also in the summer of 2009, J.M. reported to her therapist that Curtis had sexually abused her. Based on J.M.'s allegations, Curtis was incarcerated in September 2009 on criminal charges of lewd and lascivious conduct with a child. While he was incarcerated, mother had several telephone conversations with him in front of the children. During at least one of those conversations, she expressed her belief in his innocence. Based on this chain of events, all three children were removed from mother's care and placed in their current foster home in December 2009. A new CHINS petition was filed and an updated disposition plan called for mother to participate in anger management counseling and individualized counseling, among other things.

In 2010, DCF filed TPR petitions concerning all three children. The TPR hearing concerning J.M. and A.M. was held in June 2010. At that point, mother had been terminated from anger management counseling and individual counseling for missing too many appointments and her visits with the children had been changed from unsupervised to supervised as a result of evidence that the children were talking on the phone with Curtis. In July 2010, the court terminated mother's parental rights with respect to her older two children, and this Court affirmed the termination order in December 2010. In re J.M. & A.M., No. 2010-300 (Vt. Dec. 14, 2010) (unpub. mem.), available at: http://www.vermontjudiciary.org/d-upeo/upeo.aspx.

The TPR hearing concerning K.C. was held over two days in April 2011. Following the hearing, the court granted the termination petition, concluding that changed circumstances existed because of mother's failure to make any significant progress towards reunification and that termination of mother's parental rights would further K.C.'s best interests. Mother appeals that order. She challenges certain court findings, claims error in the court's failure to consider K.C.'s relationship and potential placement with the child's maternal grandmother, and blames DCF rather than herself for her failure to make progress towards reunification.

We first consider mother's challenges to various findings. See <u>In re A.F.</u>, 160 Vt. 175, 178 (1993) ("When findings are attacked on appeal, our role is limited to determining whether they are supported by credible evidence."). She contends that there is no evidence to support the court's finding that she failed to "complete" anger management counseling. The evidence is undisputed that mother had not completed anger management counseling, as indicated by her own testimony that the anger management counseling continues until the counselor concludes it is no longer needed, that she stopped attending after twelve to twenty visits because she did not have transportation, and that she now goes "every couple of weeks" when she can find a ride. Even assuming that the trial court fully credited mother's testimony, the court's finding that mother has failed to "re-engage" in anger management counseling due to transportation issues when she lived within walking distance of a bus route until her recent eviction is supported by mother's own testimony that she had started going again irregularly, when she could "find a ride." Mother does not argue that she has completed anger management; by arguing that she has "started anger management classes again" mother implicitly concedes that she has not completed her anger management program.

Next, mother argues that it was clearly erroneous for the court to cite the lack of increased visits as evidence against her when DCF denied her request for increased visitation. The court's finding that mother's visits had not increased in over one year was accurate, regardless of the underlying reason. A DCF social worker testified that mother's visitation was not increased because she had not participated adequately in counseling services. In any event, the court's finding is not clearly erroneous.

Mother also challenges the court's finding that she had failed to engage in the individual counseling required by her case plan. Mother cites the testimony of her therapist stating that she had gained insight into her problems. Again, the record supports the court's finding. First, mother conceded that the trial court had previously found, in June 2010, that her former counselor terminated their work together because mother missed too many appointments. Mother's most recent counselor testified that mother begin counseling with her on January 28, 2011, that she had missed three of her eleven scheduled appointments, and that she had spoken to the counselor by phone in lieu of in-person meetings in three other cases. The case plan required mother to engage in individual counseling concerning her past victimization so that she could gain insight into her past behavior and the danger she posed to her children. Mother's counselor acknowledged that the purpose of the current counseling with mother was to help her through the grief she was experiencing over the loss of her older two children, and further stated that they "never fully worked on her personal issues of past trauma." According to the counselor, they "were going to be addressing" those issues and thus it would not be appropriate for her to comment on any progress that mother may have made towards reunification. In light of all of the above evidence in the record, the court's finding regarding mother's lack of sufficient advancement through counseling is not clearly erroneous.

Mother also challenges the court's finding that she did not have an active application for SSI benefits pending. According to mother, her therapist's testimony that she had post-traumatic stress syndrome, late onset, and her own testimony that she had renewed her application for SSI benefits and was awaiting a determination on that application, substantially undercuts the court's suggestion that she was malingering in her search for employment. Again, we find no error. The court correctly found that mother had not worked since 2005 and that, although she claimed to be

3

disabled, she was not receiving SSI benefits. Even if we assume that the court found mother to be credible in testifying that she had an application for SSI benefits pending, its finding that she had no such pending application is harmless in that it did not diminish the court's point that mother had no source of income through employment or government benefits.

Next, mother challenges the court's finding that she has "limited ability" to apply to her own circumstances the parent education classes she took. According to mother, this finding is undercut by the testimony of service providers that she had a bond with K.C. and had acted appropriately towards the child during visits with her. The challenged finding is supported by the record, which includes—by agreement of the parties—the findings and conclusions from the earlier termination proceeding involving K.C.'s older siblings. Those findings indicate that mother had significant difficulty controlling the older two children during visits with them. Mother may not have had any significant problems while visiting K.C. but the limited nature of that visitation, and thus her limited opportunity to demonstrate any progress in applying what she may have learned in parent education classes, resulted from her failure to follow through with services deemed necessary for her to be in a position to care for her children.

Mother also argues that the court's finding regarding her then-current unsettled living situation is misleading and should be given no weight because DCF would not have allowed visits with K.C. even if her living situation had been more stable. This argument is unavailing. The court's finding concerning mother's then-current living situation was accurate and relevant to the court's conclusion that mother was not likely to be able to resume her parental duties within a reasonable period of time.

Next, mother argues that the court erred by failing to make findings about K.C.'s relationship and possible kinship placement with her maternal grandmother, in violation of 33 V.S.A. § 5114(a)(1), which lists as one of the factors for the court's consideration the child's relationship with "any other person who may significantly affect the child's best interests." Mother cites the grandmother's testimony explaining that she and her husband lived with mother and K.C. for a period of time until they obtained their own place and that she saw K.C. often until the child was taken into DCF custody. We find no error. K.C.'s relationship with her maternal grandmother arose primarily from visits while the child was in mother's care. According to the court's earlier findings, following the disposition hearing DCF suspended visitation between the children and the maternal grandparents because of concerns that they were allowing Curtis to have contact with the children. The grandmother did not thereafter seek court-ordered visitation with K.C. At the time of the TPR hearing, the grandmother had not seen K.C. for eighteen months, more than half of the child's young life. Given these circumstances, the court did not abuse its discretion in not making findings on K.C.'s relationship with the maternal grandmother. Moreover, even if the grandmother could be characterized as someone with whom K.C. had had a significant relationship, mother fails to demonstrate how findings regarding this relationship would have altered the court's termination order. Regarding mother's suggestion for some sort of an alternative placement order, her attorney asked the court at the termination hearing to consider a kinship placement with the grandmother if it decided not to terminate mother's parental rights. Given the court's decision to terminate mother's parental rights, it was not required to consider grandmother as a possible custodian or long-term foster placement for K.C. See In re T.T., 2005 VT 30, ¶ 7, 178 Vt. 496 (mem.) (stating that once court grants

4

termination petition based on best-interests criteria, it "need not revisit the permanency hearing options . . . and explain why it is choosing termination of parental rights over other options").

Finally, mother claims that her inability to make progress under the case plan was not her fault but rather resulted from DCF's failure to make reasonable efforts to provide services to her. In particular, she cites DCF's refusal to increase her visitation with K.C. We find no merit to this argument. The record, including the court's findings and conclusions, is replete with evidence of mother's failure to take advantage of services provided by DCF.

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
Brian L. Burgess, Associate Justice

_____
Beth Robinson, Associate Justice